# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 332 | **DATE** | 10/30/2003 |
| **CASE TITLE** | USA vs. Jeffrey Goldberg | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum. Again in summary, this court has considered all relevant factors - - those favoring as well as those disfavoring Goldberg. Unless some aspect of the presentation made during the course of the October 30 sentencing hearing calls for a different outcome, this court anticipates sentencing him at the high end of the Guideline range: 57 months in the custody of the Bureau of Prisons.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | NOV 0 3 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 10/31/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| SN | courtroom deputy's initials | | SN | | mailing deputy initials |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
     v.                        )      No.   03 CR 332
                               )
JEFFREY GOLDBERG,              )
                               )
                Defendant.     )

## MEMORANDUM

Because of concerns raised by Probation Officer Michael
Alper's summaries of a number of the letters that had been
received from victims of the depredations imposed on them by
defendant Jeffrey Goldberg ("Goldberg"), this Court notified the
parties early on that it might give consideration to a two-level
increase in Goldberg's offense level based on the unusual
vulnerability of at least some of his victims--Sentencing
Guideline ("Guideline") §3A1.1(b)--or perhaps to an upward
departure (see, e.g., Guideline §§5K2.0 and 5K2.3), or to both.
Goldberg's attorney has both responded to that August 8, 2003
memorandum and, apparently on the theory that the best defense is
a good offense, has sought a downward departure.

To date no written response has been forthcoming from the
government, although Assistant United States Attorney Scott
Levine has submitted the October 7 Government's Version of the
Offense, repeating in material part the 11-plus page description
of Goldberg's admitted predatory activities as set out in his

April 23, 2003 Plea Agreement. This should not be taken as a criticism of the prosecutor, however, for the August 18 memorandum had concluded by stating:

> It is not necessary that either counsel address those subjects by written submissions (including any relevant case citations) in advance of the sentencing date, but they should be prepared to discuss both those issues on that date.

Although this memorandum has been completed just in advance of any oral submissions that counsel for the parties may make during the scheduled October 30 sentencing hearing, of course this Court has already given a great deal of thought and study to the problem, and--because the sentencing decision will obviously play such a substantial role in Goldberg's future--this Court considers it appropriate to reduce its present views to written form. If anything that develops during the sentencing hearing were to call for a modification of what is said here, this Court expects to remain open to a possible revision of these views.

To focus first on the "vulnerable victim" issue, this Court of course recognizes the need to avoid any element of double counting that would be implicated if the identical factors that constitute an abuse of trust (see Guideline §3B1.3) were to be treated as automatically providing a further showing that one or more victims of Goldberg's crimes was or were unusually vulnerable. On the other hand, the October 22 Sentencing Memorandum and Motion for Downward Departure ("Memorandum") filed

by Goldberg's attorney Jed Stone, Esq. seeks to focus on the devastation that counsel represents as having been wreaked on his own client's life--a wholly self-inflicted wound, it must be said--and then to contrast that with the situation of Goldberg's victims by saying this in Memorandum at 3:

> Most of the investors had net worth in excess of three million dollars. Their average loss was under one hundred thousand dollars. These victims were, by and large, venture capitalists who sought large returns on risky investments.

Because that portrayal seemed seriously inconsistent with at least a material number of the supplemental reports that Probation Officer Alper had submitted to this Court after completing his thorough Presentence Investigation Report ("PSI")--supplements that had provided capsule summaries of the numerous letters received from victims of Goldberg's massive fraud (amounting at the most recent reading to some $9.1 million)--this Court asked Probation Officer Alper to provide it with all of the victims' actual letters, both favorable and unfavorable. This Court has read all of those letters. And before this memorandum turns to the substance of those letters, some of which must be dealt with at length or in full to convey their flavor accurately, it must frankly be said that if the Memorandum by Goldberg's counsel had been a securities prospectus, the language that has been quoted earlier (and some other portions as well) would present a serious violation of

Section 10(b) of the 1933 Securities Act and of its
implementation in SEC Rule 10b-5: It includes untrue statements
of material facts, or it omits material facts necessary to make
its statements, in light of the circumstances, not misleading.

Before this memorandum speaks to that inaccuracy, however,
it might be observed parenthetically that the paragraph quoted
above from defense counsel's Memorandum--almost hinting that
Goldberg's victims asked or deserved to be fleeced because of
their own profit-seeking goals--is a bit redolent of the
defendant to a rape charge who says that the victim could or
should have expected to be attacked, or even that she deserved
it, because she dressed in a provocative miniskirt. But that
aside, some chapter and verse response is in order to demonstrate
the inaccuracy of defense counsel's statement in factual terms,
so as to justify the pejorative label that this memorandum has
attached to it.

Although this Court has received and read letters from more
than 20 of Goldberg's victims, it is worth reading just four of
them to demonstrate graphically why this case indeed involves, as
Application Note 2 to Guideline §3A1.1(b) puts it, more than one
"unusually vulnerable victim in which the defendant knows or
should have known of the victim's unusual vulnerability"--a term
referred to in the same Application Note as having such
vulnerability "due to age, physical or mental condition, or who

4

is otherwise particularly susceptible to the criminal conduct."
Such detailed treatment is engaged in with some reluctance,
because this Court recognizes that doing so may serve to reopen
painful wounds or to keep those painful wounds open. But it is
also true that by the victims' having responded to the request by
government counsel for their statements, as they have, they have
already shared those wounds with strangers, so that airing the
statements publicly really poses no inconsistency.

Those four letters are the ones received from Bess
Nagelberg, Ina and Royce Williamson, Janyce Cagan Agruss and
Lynne Miller Socol. Look at what they say.[1]

To go beyond those statements would be, as Shakespeare put

---

[1]  Those letters are attached as exhibits to this
memorandum, although this Court anticipates reading them aloud
during the sentencing hearing in the course of expressing its
ultimate views. Brief added comments should be made as to two of
those victims:

1. In a follow-up letter Ms. Agruss has identified her
financial loss as $1,611,500, for which she has obtained a
judgment against Goldberg--for what little any such judgment
may be worth.

2. As to Ms. Socol's letter, this Court gives no
consideration to her characterization of the Phoenix-
Scottsdale episode that she describes. This Court has read
the explanation by Goldberg's counsel in that respect (Mem.
5 n.1), and it is obviously not in a position to reach any
factual conclusions on the matter. Nor does this Court draw
any inference as to Goldberg's asserted concealment of any
ill-gotten gains, as suggested by Ms. Socol. In terms of
Ms. Socol's letter, as with the others, this Court's focus
remains solely on the vulnerable victim issue.

it, "to gild refined gold, to paint the lily...."[2]  It is true

that this Court has been selective in thus choosing the materials

that best illustrate the applicability of the vulnerable victim

provisions to the circumstances of this case, although a number

of the other letters portray the same pictures in varying

degrees, some of those others close to the four that have been

dealt with at length.  But this Court is prepared to hold that

those four statements alone amply demonstrate that Goldberg's

crimes fit very comfortably within the terms of Guideline

§3A1.1(b) and the caselaw.  In that regard it is worth quoting

from the most recent statement by our Court of Appeals dealing

with that Guideline, <u>United States v. Sims</u>, 329 F.3d 937, 944

(7th Cir. 2003), after having quoted Application Note 2:

> The government need only establish that a single victim
> was vulnerable in order for the enhancement to apply.
> <u>Parolin</u>, 239 F.3d at 926.  Further, no other factor
> need accompany age so long as the victim's
> vulnerability is related to the victim's age.  <u>See</u>
> <u>United States v. Williams</u>, 258 F.3d 669, 672-73 (7th
> Cir.2001).  Elderly victims satisfy the requirements of
> §3A1.1(b)(1), especially when their financial
> investments and financial security are at issue.  <u>See</u>
> <u>United States v. Seward</u>, 272 F.3d 831, 841 (7th Cir.
> 2001); <u>United States v. Stewart</u>, 33 F.3d 764, 770-71
> (7th Cir. 1994); <u>United States v. Haines</u>, 32 F.3d 290,
> 293 (7th Cir. 1994).

That last sentence may well have been written expressly as

to Goldberg's aunt Ms. Nagelberg, and perhaps as to others among

his elderly victims whose statements have not been reproduced

---

[2]  William Shakespeare, <u>King John</u> act 4, sc. 2, line 11.

here. And vulnerable victim status is not reserved to the elderly--such victims as Ms. Agruss, whom Goldberg targeted at a time that he knew to be "truly at a vulnerable point in my life" (her accurate self-characterization) fit that label like a glove for different and legitimate reasons. Indeed, the same is true (albeit perhaps to a lesser extent) as to the other two victims whose statements are included here, and as to some others whose statements are not.

Although as stated earlier the prosecutor has not spoken directly to the vulnerable victim issue, Government's Version of the Offense 13-14 provides an accurate capsule summary of the victims' letters in their totality:

> As detailed in the victim letters submitted to the Court, victims of Goldberg's lies and deceit lost their retirement nest eggs; money they saved throughout their lives; money they used to pay the mortgages on their homes; money that gave them the emotional security to feel confident that they were financially stable; and money they had earned through a lifetime of hard work and needed to carry on their daily lives. The emotional and financial devastation Goldberg inflicted on his victims is substantial. As the victim letters make clear, it is devastating to learn that someone you trust has defrauded you and in the process has impacted on the quality of your life.

Indeed, every individual victim or couple that has written presents an extraordinarily poignant account of a life that has been impacted to a major extent by Goldberg's crimes, whether or not the particular writer meets the demands of the "unusually vulnerable victim" category.

Does the vulnerable victim adjustment constitute impermissible double counting in light of the unquestioned applicability of the two-level adjustment for abuse of trust? Not at all. There are a host of cases decided by Courts of Appeals around the country that speak to that issue, but more than one from our own circuit confirm the applicability of that conclusion to this case. Thus <u>United Stats v. Haines</u>, 32 F.3d 290, 293 (7th Cir. 1994) cited and distinguished an opinion that had found such double counting in a very different situation from the one before the <u>Haines</u> court (that earlier case was <u>United States v. Kopshever</u>, 6 F.3d 1218 (7th Cir. 1994), which by sheer chance was written for the panel by this Court, then sitting by designation). As <u>Haines</u>, 32 F.3d at 293-94 explained:

> In this case, the situation is different. The facts in this record are sufficient to support each adjustment. Furthermore, the district court did not "draw from the same well" when imposing the upward adjustments. One adjustment focuses on the victim, who was demonstrated to be vulnerable. The other adjustment looks to the conduct of the offender, who abused a position of trust.
>
> It is true that Mrs. Hoskins's vulnerability, her age and inability to care for herself, enabled Haines to gain her trust. But it is the abuse of that trust by Haines which led to the second adjustment, not Mrs. Hoskins's vulnerability. In <u>United States v. Boula</u>, 932 F.2d 651, 655 (7th Cir. 1991), we stated that the "Guidelines sections are not mutually exclusive." In other words, even if there is some overlap in the factual basis for two or more sentencing adjustments, so long as there is sufficient factual basis for each they may both be applied.

Accord, more recent cases such as <u>United States v. Rumsavich</u>, 313

F.3d 407, 413-14 (7th Cir. 2002) and cases cited there, and United States v. Paneras, 222 F.3d 406, 412-14 (7th Cir. 2002)

With the applicability of Guideline §3A1.1(b) thus having been cemented, something should be said about the extent of adjustment called for by that provision. In the language of that section, two levels up from the otherwise-applicable offense level are called for "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," but another two level increase is called for by the Guideline if "the offense involved a large number of vulnerable victims." In the latter respect the Application Note states:

> Subsection (b)(2) implements, in a broader form, the instruction to the Commission in section 6(c)(3) of Public Law 105-184.

This Court has consulted that cross-reference and has found it to be part of the Telemarketing Fraud Prevention Act of 1998. But even though the Sentencing Commission has chosen to implement that concept "in a broader form," making it applicable to "a large number" generally rather than restricting it to fraudulent appeals to a mass market, it cannot fairly be said--despite the egregious nature of Goldberg's conduct toward those of his victims who may clearly be characterized as vulnerable--that the vulnerable victim category applies to enough people who have suffered at his hands to justify the substantially more severe adjustment. Accordingly this Court is prepared to modify the

9

PSI's analysis to bring the total offense level to 23 (and not 25) rather than 21.

This memorandum next turns to the portion of Goldberg's Memorandum in which he has moved for a downward departure. As might be suspected from what has already been said here on the vulnerable victim subject, any such effort on his part to obtain especially favorable treatment faces an uphill battle. But something else must be added in response to the Memorandum's attempted emphasis on general declines in investment values for which Goldberg cannot be blamed.

What that emphasis glosses over--or more accurately ignores entirely--is that Goldberg is not being sentenced for being an unfortunate investment advisor, himself victimized by a downturn in the market. Although attorney Stone, like Goldberg himself, signed the Plea Agreement, he seems to have forgotten in the intervening six months the detailed recital of Goldberg's crimes that occupies fully 11 pages in that document (repeated essentially, as stated earlier, in this month's Government's Version of the Offense). In the most important sense, Goldberg's investment skills are an aggravating rather than a mitigating factor: They facilitated his opportunity to engage in his crooked conduct by attracting his victims and then lulling them into a false sense of security.

As for any contention that Goldberg did not start out

intending to be a criminal, this Court is reminded of the circumstances that led to what has become the generic name for fraudulent activity: the "Ponzi scheme." Ponzi originally discovered a legitimate profit opportunity, based on the arbitrage involved in money transactions--although this Court's recollection may be wrong, it believes that those involved the use of postal money orders between the United States and Italy. Initially Ponzi had found that he could provide a meaningful return for investors while at the same time making money for himself. From that discovery he then assumed that if he were to increase the volume of his activity, he could expand his own income greatly while continuing to deliver the same impressive yield to a larger group of investors. Where he went wrong is that when extremely large numbers of Italian immigrants came flocking to take advantage of what they understood to be a fine investment opportunity, and when Ponzi then discovered that it didn't work in such large numbers, he then continued to solicit ever-increasing numbers of investors to get funds with which he could rob Peter to pay Paul--or in that instance, to rob Pietro to pay Paolo.

Here Goldberg's activities were materially more reprehensible than Ponzi's, although some of his fraudulently obtained proceeds were employed in the same way--for example, his use of money obtained from persons whom he solicited to invest in

11

the Willow Bay and HCC ventures. In contrast to Ponzi's initial
level of naivete, Goldberg was admittedly very smart and
sophisticated. And he abused those talents by mulcting his
unknowing investors to the tune of some $9.1 million in losses.

It is also worth observing that this is not an instance of
the sort of situation about which the most notorious con man in
Illinois history, Yellow Kid Weil, spoke when he said in essence
"I never conned anybody who didn't have some larceny in his own
heart." Or to draw another well-known catchphrase from the con
game lexicon, "If somebody offers you a deal that sounds too good
to be true, that's because it's not true." In this instance
Goldberg instead took legitimate good-faith investors into what
appeared to be legitimate and plausible investments, then
proceeded to engage in the extensive frauds that he has expressly
admitted in his Plea Agreement--but that he seems now to have
forgotten conveniently, if his lawyer's Memorandum statement on
his behalf is to be credited.

In summary, this Court cannot in good conscience give
favorable consideration to any notion of downward departure,
whether based on the reason that has just been rejected or on the
level of Goldberg's cooperation or remorse--both of which are
accepted as genuine--or based on any other reason. That being
the case, unless the sentencing hearing itself calls for a
different conclusion, this Court's determination calls for an

offense level of 23 and a criminal history category of I, and hence for a Guideline sentencing range of 46 to 57 months.

What remains then is the question as to where Goldberg should be placed within that range. Although there may be a good deal to be said, in light of what has been discussed to this point, for considering an upward departure from the Guideline range as well, this Court's concerns over any ruling involving double counting, as well as over the possibility of overreacting to the harm that Goldberg has wreaked on the people who reposed total trust in him, prevents this Court from taking that added step.

But with that said, this Court believes that its views on one relevant aspect of a seriously flawed Sentencing Guideline system are well known: Despite what the system's proponents and defenders urge as the system's virtues of precision and objectivity, the surface appearance of such attributes--fostered for example by the grid that looks so definitive and comforting in those respects--really masks factors that implicate the ultimate in subjectivity. That contrast is well demonstrated, for example, by comparing the treatment of financial crimes such as Goldberg's (so-called white collar crimes) with other offenses such as drug offenses or bank robbery.

To choose the latter, for instance, how should the system objectively equate the robbery of a bank that generates proceeds

of (say) $2,000 or $3,000, without the robber's use of even a false "I have a gun" note, with the perpetration of a massive fraud by another criminal who instead uses false representations to investors to accomplish his or her goal? How much money must the white collar criminal in the latter category obtain to put him or her into the same sentencing range as the robber? It appears from looking at Guideline §2B3.1(a) and former Guideline §2F1.1(b) that something over $1.5 million was the answer as to the white collar criminal until that former Guideline was deleted by consolidation with Guideline §2B1.1 effective November 1, 2001 (to take such white collar crimes more seriously). Or to take the other example, how much must the white collar fraudfeasor extract from his or her victims to be placed on a parity for sentencing purposes with the person who possesses a kilo of cocaine with the intent to distribute it?

But over and above the extent to which the Guidelines import substantial subjectivity, rather than the semblance of objectivity created by the Guideline grid, one thing appears reasonable to believe: Prospective white collar offenders, those who might consider engaging in deliberate financial offenses and who are typically among the more privileged members of our society, would seem more likely to be deterred by the knowledge that such crimes will be met with serious punishment for having torn the societal fabric than (say) the bank robber, who would

seem to be an unlikely candidate for engaging in any reasoned cost-benefit analysis. As a matter of sentencing philosophy, then, this Court tends to favor the imposition of meaningful sentences in response to the kind of deliberate criminal activity of the type at issue in this case.

Again in summary, this Court has considered all relevant factors--those favoring as well as those disfavoring Goldberg. Unless some aspect of the presentation made during the course of the October 30 sentencing hearing calls for a different outcome, this Court anticipates sentencing him at the high end of the Guideline range: 57 months in the custody of the Bureau of Prisons.

Milton I. Shadur
Senior United States District Judge

Date: October 30, 2003

# BESS NAGELBERG
## 1700 W. RAND ROAD, #B101
## ARLINGTON HEIGHTS, ILLINOIS 60004

July 23, 2003

United States Attorney's Office
Attention: Ms. Lisa Diaz, V. W. Coordinator
Illinois Northern District
219 S. Dearborn Street - 5th Floor
Chicago, Illinois 60604

> Re:  **USAO Number: 2002 ROO466**
> **Court Docket No.: 03 CR 0332**
> **(Jeffrey L. Goldberg)**

Dear Mrs. Diaz:

I am enclosing a Victim Impact Statement, as requested in the letter, dated June 10, 2003, from Assistant U.S. Attorney Scott D. Levine to my husband Jack c/o of me. My husband was tragically killed in an auto accident in April, 2003.

Jeffrey L. Goldberg is our nephew. Based on our trust of him and his expertise and experience as an investment adviser/broker and attorney, who drafted my husband's and my estate planning documents, my husband and I invested our entire IRA assets in Cole Taylor Bank accounts, totaling $70,750.00, in H.C.C. Funding, L.L.C. Mr. Goldberg was the Executor of my husband's and my Estates, until he was recently replaced. My husband and I invested an additional amount of $64,651.99 in H.C.C. Funding, L.L.C. My husband and I were in our 80's when these investments occurred.

The total amount of $134,401.99 invested in H.C.C. Funding, L.L.C. comprised the majority of my husband's and my entire lifetime assets, other than Social Security. We were devastated, financially and emotionally, when we became aware in 2002 that our investment in H.C.C. Funding, L.L.C. was worthless. We have therefore lost the entire amount of $134,401.99 that was invested in H.C.C. Funding, L.L.C.

Mr. Goldberg never returned my husband's telephone calls to him inquiring about this matter. We simply received the attached letter from his attorney. My husband and I primarily depended on the monthly payments from our investments in H.C.C. Funding,

Lisa Diaz
July 23, 2003
Page - 2 -

L.L.C. for paying our day-to-day living expenses. My husband and I rented an apartment at the above Arlington Heights address, and now I am going to have to find a new home. Fortunately, two children have helped my husband and I financially to subsist. The loss of our assets invested in H.C.C. Funding, L.L.C., not only depressed my husband and I, but also resulted in my receiving medical treatment for depression.

I cannot believe that our nephew, Jeffrey L. Goldberg, has destroyed our lives financially, emotionally and health-wise at this stage of our lives. And he has failed to apologize to us directly for his conduct.

Sincerely,

Bess Nagelberg

Bess Nagelberg

BN/cld

Royce and Ina Williamson
416 E. Bay Tree Circle
Vernon Hills, IL   60061
August 5, 2003

United States Attorney's Office—Illinois Northern District
Attn: Ms. Lisa Diaz, V.W. Coordinator
219 S. Dearborn St. – 5th Floor
Chicago, IL   60604

RE: Jeffrey L. Goldberg, USAO #2002R00466, Court Docket #03CR0332
    Impact Letter

Dear Ms. Diaz,

March 28, 2002, was the beginning of the worst time in our lives.  On that day, Royce went to Essex Financial, as instructed by Jeffrey Goldberg earlier in the day, to pick up a check for approximately $200,000 with which we would begin our new business.  We were to be one-third of a partnership in a franchise to open and operate 30 Maggie Moo ice cream stores in the Chicagoland area over the next 10 years.  When Royce spoke to Laurie Smith at Essex, he was told that they did not have a check because we did not have any money.  As a result of the actions of Jeffrey Goldberg and Essex Financial, we lost in excess of $800,000 and were broke!

Royce was so shocked and upset that Mark Jacobs of Essex tried to keep him in the office to calm down before Royce got into his car.  When I called Essex two hours later looking for Royce, I was given the horrifying news, told of Royce's condition when he left them and advised to call the police.  Royce was missing for five hours; he was driving around in a state of hysteria, not even knowing when he was, feeling totally distraught and contemplating suicide, and terrified about breaking the news to me that our financial future had been destroyed.  And all at the hand of Jeffrey Goldberg—one of our closest friends whom we considered "family," someone with whom we shared holidays and vacations, whose wife was one of my best friends, and who was given our unconditional trust to advise us and invest _all_ of the early retirement funds Royce received from Sears.

Royce spent time, from March 17 through March 26, in Washington, D.C. with Maggie Moo's training division prior to signing contracts and completing the financing for his proposed business. During that time, Jeff celebrated his 50th birthday with some close friends at a dinner. I sat next to him and we discussed how much Royce was enjoying his training and how excited he was to be embarking on this new venture. Jeff seemed genuinely happy and said, "This is going to be great. This is Royce's *destiny*." Five days later, we learned that we did not have the funds to proceed with our franchise plans. Our partners managed to pull together extra capital to cover our share and revised the contract to eliminate us. Although they were truly upset about our financial ruin, they did not offer us even a small percentage of the business. Despite the fact that Royce came to them with his idea of obtaining franchise rights for ice cream stores, researched the various companies operating these franchises, and spent one year developing his plans, they are now the proud owners and Royce became, temporarily, an employee. All thanks to Jeffrey Goldberg.

We were also in the process of building a new home in Vernon Hills. We had already signed a contract with Zale, remitted $17,500 in earnest money , and were to close in December 2002. Needless to say, we could not move forward with our new home. We notified Zale and explained our situation, but they refused to refund any of our money and told us if we did not continue our building process we would be in default. Even when our lawyer spoke to them, they were totally uncooperative. So because of Jeffrey's fraud, we now lost additional money. In addition, we could no longer afford to live in our Buffalo Grove home. We sold our beautiful home for less than it was worth because we had a limited timetable. Once again, our future was compromised; we are now renting a townhouse and cannot foresee purchasing anything. We did learn, however, that the Goldbergs were able to purchase a home recently. It just doesn't seem fair!

In order to support ourselves now, I am working full time and Royce is working six days a week doing a great deal of physical labor, but together we earn only half of what Royce alone previously earned. This was not the way we planned to spend this stage of our lives. We had thought our retirement was secure and that we had enough money to own a business and still maintain a comfortable lifestyle. However, our entire life—let alone our lifestyle--has changed drastically. We are able to afford only the very basic necessities. In fact, when our daughter graduated college last summer with a 3.85 average, instead of buying her a new car as we had planned, we bought her a sweater. Everyone said that she was very sweet and understood our situation; however, she shouldn't have had to understand! <u>We shouldn't have lost our money!</u>

Reflecting back over the years, we are both struck with certain of Jeff's actions that have negatively affected our lives and/or have added credence to his guilt. In 1999, Royce was unemployed and wanted to start his own business. Naturally, he spoke to Jeff who introduced him to two men with whom Jeff had previous dealings. Together Kevin Koy, Russ Felker and Royce began Friends2 B Made, a make-your-own stuffed animal store. The idea was theirs; the entire investment was ours.

We entered into this partnership with the utmost confidence since Jeff knew these men and guided us through the financial process. Our business failed because after opening our second store in Maryland, Russ and Kevin stole $100,000 from a company bank account, leaving Friends 2 B Made nearly insolvent.   It wasn't until after they walked away from the business that Royce found the two checks Russ had written to himself. We immediately informed Jeff who advised us not to prosecute because it was their word against ours!  We repeatedly asked for his assistance to regain our money, and he repeatedly used his now-famous skills to convince us that it would be a futile effort.

In 2001, Jeff represented Royce in a lawsuit brought upon Friends 2 B Made by a contractor in Maryland to whom the company owed $48,000 for work that began on the Maryland store.. We agreed to pay $10,000 at that time with the balance to be divided among Koy, Felker and us,and remitted in one year.   In November of 2002, the plaintiff's lawyer, Bryan Reed, froze *our* checking account until *we* paid the entire balance since neither Kevin Koy nor Russ Felker supposedly were employed or had any money.   Apparently, Koy's ex-wife was paying for the house in which he and his current wife live, and Felker's father was supporting his condominium at Lake Point Towers! Because Royce and I were still trying to settle the financial burdens we had incurred, we kept the money from the sale of our house in our checking account. Once again, we who had nothing to hide and who were obviously too naïve to expect more trouble, were forced to release funds to cover the entire amount of the lawsuit; and Koy and Felker paid nothing!

Recently we learned that Kevin Koy was the licensing agent for HCC Funding—the imaginary account held by Cole Taylor Bank in which most of our money was "invested," and for which we continued to get monthly statements stating that we still had over $800,000. Obviously, Jeff's dealings with Kevin Koy continued despite Koy's previous criminal activity with us.

Losing this much money when we had so little left added an immense strain to our already dismal situation. I spent a great deal of time crying and am taking Lexapro and Wellbutrin to control my depression. Royce has felt unreasonably responsible for ruining his family's life. His sense of failure and hopelessness brought him very close to having a nervous breakdown, and he was suffering continuous anxiety attacks. Some came upon him while he was driving, forcing him to pull his car to the side of the road. One especially serious attack at home caused me to call the paramedics since Royce was unresponsive and gray in color. He has been depending on Lexapro and Ativan to control these attacks. Although his condition has improved, he still experiences bouts of anxiety.

As time progresses, we keep reading and hearing more about Jeff's transgressions. It appears that we have been pawns of his for many years. Neither of us can imagine how he could have forged Royce's signature on a promissory note to another friend's parents, how he could take a cruise vacation with us and stop off at a bank in Nassau, how he could have set us up with his criminal associates, how he could pretend to guide us while he was stealing all of our money, and how he could feign his affection for our family while he was knowingly betraying us. We have been questioned and ridiculed for our unconditional trust in this man. We no longer have financial security, we have strained personal relationships with mutual friends of ours and the Goldbergs, we have been suffering terrible emotional anguish, and we are both working very hard to maintain our now simple lifestyle. Whatever sentence Jeffrey Goldberg receives will be light compared to our sentence: the destruction of our life savings.

Mr. Jed Stone has stated that his client, Jeffrey Goldberg, "should not be judged by the worst five minutes of his life....." Evidently Mr. Stone has no real sense of time!

Sincerely,

*Ina Williamson*

Ina Williamson

*Royce Williams*

Royce Williamson

July 13, 2003                                    Joyce Cogan Agress

To Whom It May Concern:

Thank you for the opportunity to share this information. Let me start off by saying that I hope that anyone who is reading this letter never has to go through anything like this. I will try my best to put into words what this experience and my feelings have been, but at least for me I do not know if words alone can capture the true feeling of what it was and still is like to be violated like I was violated by Jeff Goldberg.

I was truly at a vulnerable point in my life when I met Jeff Goldberg in his role as financial advisor/planner. My husband was divorcing me after 23 years of marriage to get married to someone else. My husband took care of all of our financial matters as that was his business and he was and still is very successful at what he does. At the time of the divorce I felt I needed someone that I could trust to help me negotiate and understand the financial aspect of the divorce settlement as I had no knowledge at all of financial matters. Jeff Goldberg had been working with some people I knew for many years so instead of looking to work with a stranger to get financial advice, I thought I could trust someone who had been working with these people I knew for many years. How much further from the truth could I have been. Jeff Goldberg turned out to be the scum of the earth.

At the time of the divorce, I talked with Jeff Goldberg and asked him if he would help me negotiate and understand the financial aspect of the divorce settlement and he said yes. He actually sat with me, my lawyer, and my husband and his lawyer to negotiate the financial settlement. Jeff Goldberg knew what my financial goals and needs were at all times and he knew that this settlement would have to last me for the rest of my life.

As a result of this crime that has been committed against me I have nothing left financially and as a result I have suffered emotionally, physically, and financially. This crime has not only affected me but my children and my current husband. My feelings about myself and my life have definitely been changed as a result of this crime. The emotions are probably the hardest to write about. I thought that my life was over after my first husband divorced me but I began to recover from that thinking that I was going to be ok – that I could be independent emotionally and financially. Well, lo and behold, five years after my divorce, my life came crashing down again and I don't know how I am going to recover from this. As I said previously, I felt and still feel betrayed, violated, depressed, used, manipulated, embarrassed, angry, sad, frustrated, furious, and hatred towards Jeff Goldberg at varying times and in varying degrees. And sometimes I feel them all at the same time, which make these negative feelings very intense. Please notice that the reference to emotions like "happy, content, satisfied, or pleased with life" do not apply to me anymore. We don't have fun and we don't laugh like we used to.

I worry **all** the time and I feel stressed **all** the time. As a result I am not a pleasant person to be around lately because I feel so many of these negative feelings all the time. I believe that my relationship with both of my children and current husband have suffered

as a result of this trauma that has been inflicted upon me. Things are always stressed, strained, and tense between and amongst us. Even my ex-husband says this is my fault which reinforces his belief that I could not handle financial matters.

I have also suffered physical consequences as a result of this crime. In the past two years since I have come to understand all of what has been going on, I have gained a significant amount of weight, my blood pressure is elevated to the point of needing blood pressure medication, and my hair has been falling out. My health was perfectly fine prior to this crime.

Next, I will speak to the financial impact of this crime. The most important and major impact is that I am in jeopardy of losing our home and I have had to sell off some of my personal possessions. Unlike the companies Jeff Goldberg worked for, I do not have insurance to pay for lawyers in this case. I needed to take a loan out against the house so I could hire lawyers to try to get my money back. All I think about is what are we going to do if we lose the house? Where are we going to live? What will happen to my kids? What will happen to my dogs? I now work two jobs (previously I worked part-time because I wanted to not because I had to) to try to maintain the house and the household. I don't buy myself new clothes or new shoes, but I use the things that my daughter does not use or want anymore. The fact that I now work two jobs contributes to the emotional and physical issues I have discussed above. My time with my children and husband is very limited because I am always working and when I am not working (which is not very often) I am exhausted. I never thought I would be needing to do what I am having to do at this point in my life.

In summary I have attempted to explain to you what Jeff Goldberg's crime has done to both me and my family.

LYNN MILLER SOCOL
290 GREENWOOD AVENUE
GLENCOE, ILLINOIS 60022
(847) 242-9801


U.S. Department of Justice
United States Attorneys Office
Illinois Northern District
Attn: Mrs. Lisa Diaz, V.W. Coordinator
219 S. Dearborn St., 5th Floor
Chicago, IL 60604                    July 24, 2003


Re:    USAO Number: 2002R00466
       Court Docket Number: 03CR0332
       Jeffrey L. Goldberg, Defendant

Your Honor:

I am writing this victim impact statement to familiarize you and others who
may read it with a small part of the background to my case and the effect
Jeffrey Goldberg ("Goldberg") has had on my family and me.

My husband and I invested our hard earned money with Goldberg in 1994
for the purported Willow Bay development in Antioch, IL. My in-laws,
retired senior citizens, also invested with Goldberg in the project, along with
my brother. My husband and I have invested in numerous other real estate
projects with other limited partnerships, and were familiar with usual and
customary business practices and documentation available and sent to
investors.

However, nothing in my previous experience could prepare me for the way
Goldberg conducted himself during the next 7 to 8 years. I, my husband, and
my brother continuously telephoned Goldberg to beg for documents showing
how the project was doing financially (i.e. K-1's, financial statements, etc.)
and to find out the progress in the development. I am not exaggerating when
I say that we called Goldberg in excess of 100 times to try to speak with
him. He rarely returned phone calls, even in the beginning. In fact, we had to
make an appointment with his then secretary for a specific time to call in
order to even attempt to contact him by phone. When we did get the chance

to speak with Goldberg, he always had an amazingly extravagant story of people with whom he had met at the mayor's office, city council, zoning board, planning department, etc. It got so difficult to get a hold of Goldberg, that when I finally did, I would take copious notes for my files of names, dates, and places of people and events he said he had met with. I was getting an uncomfortable feeling about his unavailability and lack of backup documents for the project in about 1999 or so. Finally, after much badgering, Goldberg presented us with a notebook, quite professional looking, "evidencing" documentation about the validity of the project. We continued to ask for K-1s, and never received anything-for years. It became impossible to get in touch with Goldberg either by phone or in person, and in the chance event we ran into him at a social function, he always had an update about how the project was doing, and how he was having trouble with the adjacent property owners, the zoning board, the mayor's office, this and that councilperson, etc. Excuse after excuse after excuse about why the project was never moving ahead. Here is an example from my notes during one of my telephone conversations with Goldberg (Goldberg speaking):

"We are in serious negotiations with a retail developer from Minneapolis who is interested in a lot more retail properties than he thought. Lake Villa city wants the project. The mayor and city also want the project. It may take 4 months extra, because it is not zoned for either yet. The meeting with the buyer is this week, Friday or Saturday. The village meeting is next week, and the zoning meeting will be in March. I have hired Alan Krakower (sp?), as a land planner. He is very well known in Illinois".

By 2001, I finally realized that Goldberg was a disgusting habitual liar, and had stolen all of our investment. I got out my notes and started making calls to all of the people Goldberg had named in his "dealings". First, I called the mayor's office in Antioch and Lake Villa. They checked their records, and told me that the mayor had never met with anyone from Willow Bay, a Jeffrey Goldberg, or anyone regarding said proposed project. I then called the County Recorder's office, and found that the property was not even owned by Goldberg or anyone remotely connected with his purported Willow Bay project and that property taxes were being paid by totally unrelated parties. I then called everyone I knew who had invested in a Goldberg project and advised them of my findings. Shortly after my discovery, I found out that Goldberg had been fired from his most recent job, and was in the process of declaring bankruptcy, being investigated by the FBI, State's Attorney, etc.

To add insult to injury, while my husband and children and I were vacationing in Phoenix this past Christmas (December 2002), here is what happened. We drove up to the brand new Marriott Desert Ridge hotel in Phoenix and I got out of the car. The first person I saw was Jeffrey Goldberg! Shocked, I told my husband and he ran after Goldberg to try to talk to him about what was going on, however, Goldberg ran away from him. We were seething! Goldberg supposedly had no money, no income, no job, a wife who didn't work, and was staying at a $350 a night hotel on vacation with his wife and two teenage sons. We went out to the pool with our children to wait for our room to be readied. Who is sitting out on recliners at the pool, but Goldberg and his family. After much debating back and forth whether or not we should approach him in front of his family, I finally told my husband that Goldberg didn't mind stealing our money for his family's support, trips, etc., so why should I continue to be nice and not let him or his family know what I thought of him. I did. I walked up to Goldberg and asked Goldberg whose money was paying for this vacation-his relatives, his friends, or his investors from before from whom he stole MILLIONS of dollars. He said to me "Lynn, it isn't like that." His wife then started calling me a bitch, liar, etc., and threatened to have security drag me out. I told her that her husband was a lying, deceitful jerk, and she was a bigger jerk for believing anything he told her. The last thing I told Goldberg was that I had already met with the FBI, and that everyone I knew whom Goldberg had stolen from was aware that he would be indicted and sentenced. I told him that I may not get any money back, but I would be there at his sentencing, and I hoped his wife and children were there too to finally see who was telling the truth and who was the amazing liar who stole millions of dollars from kid's bar mitzvah funds, retired people's sole retirement funds, hard earned money by hard working people who believed Goldberg's web of stories over the last 8-10 years. That would be some small justice to me.

I then told a friend of mine in Phoenix who knew Goldberg and his wife that we had run into him. She told me that she knew that Goldberg and his family had just left staying at the Ritz Carlton in Scottsdale prior to arriving at the Marriott! Another luxury hotel vacation at his victims' expense when restitution should have been started. Where was the money coming from?

Your honor, Goldberg deserves to go to Federal prison, not a white collar work farm with a lot of rich, well connected white collar criminals who have

a country club atmosphere instead of a small cell with a real prison around them. He deserves to serve at least one year for every million dollars he stole from good people. Please don't allow his family or him to benefit from the money he has stashed away in hidden accounts out of this country that the FBI hasn't found. Please allow there be a real consequence to Goldberg's behavior and actions. Please restore our ability to trust again by sentencing Goldberg to the maximum allowable by law, and not accept a plea bargain for less time than the maximum. Goldberg can be very convincing, but as I have seen, his audacity is beyond the average person's comprehension. What person, other than one without any conscience whatsoever, could take his family on vacation to an expensive hotel, spending even more money that was never his, after stealing millions of dollars from countless people, after being told not to leave the state by the authorities? Why hasn't he paid any restitution to his victims rather than spending his wife's inheritance money to buy another home in Buffalo Grove? Do we all have to be victims again and again? Please prove to all of Goldberg's victims that there is a serious consequence to this type of behavior and deliberate criminal actions. Please have the authorities continue to search for his hidden bank accounts in the Cayman Islands and wherever else he may have hidden money so he cannot profit after his eventual release.

Thank you for the opportunity of allowing me to write this letter and be heard.

Sincerely,

Lynn Miller Socol